# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Tucson Indoor Football LLC d/b/a Tucson Sugar Skulls, a limited liability company

           Plaintiff,

       v.

FBG Enterprises Opco, LLC d/b/a Fanatics Betting & Gaming, a limited liability company

          Defendant.

Case No.

**VERIFIED COMPLAINT FOR:**

    i.  Breach Of Contract

   ii.  Breach Of The Implied Covenant Of Good Faith And Fair Dealing

  iii.  Misrepresentation

  iv.  Promissory Estoppel

1

**COMPLAINT**

COMES NOW Plaintiff, Tucson Indoor Football LLC d/b/a Tucson Sugar Skulls, a limited liability company ("TSS"), and based on knowledge as to itself and on information as to all others, complains and alleges of FBG Enterprises Opco, LLC d/b/a Fanatics Betting & Gaming, a limited liability company, ("FANATICS") as follows:

## INTRODUCTION

This is an action for damages and specific performance resulting from (i) a breach of contract by FANATICS, (ii) Breach of the Implied Covenant Of Good Faith And Fair Dealing, (iii) misrepresentation, and (iv) Promissory Estoppel.

## PARTIES

1. TSS is a limited liability company registered in the State of Arizona and county of Pima.

2. FANATICS is a limited liability company registered in the State of Delaware and.

3. TSS and FANATICS entered into a contract in the state of Arizona with the purpose of operating an event wagering operation in the state of Arizona.

4. Because Plaintiff resides in Pima County and Defendant does business in Arizona, and specifically because the contract was to be performed in Pima County, venue is proper in this Court.

## AGENCY ALLEGATIONS

Plaintiff is informed and believes, and thereon alleges, that each and every act and/or omission alleged herein were performed by, and/or attributable to, all Defendants, each acting as agents and/or employees, and/or under the direction and control of each of the other Defendants, and that said acts and failures to act were within the course and scope of said agency, employment, and/or direction and control.

2

VERIFIED COMPLAINT

## JURISDICTION & VENUE

1.     Plaintiff brings its complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.     Events complained of herein occurred in, or arose from, transactions and conduct occurring in whole or in part in Pima County, Arizona.

3.     In the Agreement, the parties agreed to Jurisdiction and Venue in Arizona.

4.     Personal jurisdiction is proper over Defendants.

5.     Venue is proper pursuant to 28 U.S.C. § 1391 and 1400(a).

## STATEMENT OF FACTS

1.   On or around, August 11, 2023, TSS and Fanatics entered into an exclusive Online Market Access Agreement whereby TSS granted Fanatics the exclusive right to operate under, or jointly apply for, an Arizona sports betting permit for which TSS is eligible to apply under state law. ("Agreement").

2.   The term of the Agreement was from execution until 5 years from the date in which Fanatics accepts its first real-money wager in the state of Arizona, unless earlier terminated.

3.   The scope of the Agreement specifically provided that "TSS shall grant and permit Fanatics the right to offer and operate an online sportsbook and iCasino."

4.   The Agreement further clarified in Section 10.1 that, "*the Parties agree and acknowledge to discuss in good faith opportunities for Fanatics to offer retail sportsbook services at TSS's stadium.*"

5.   The Agreement included a section 3.5 "Failure to Obtain License" that read, "*In the event that TSS is not awarded (or otherwise designated by Gaming Authorities to be awarded) a TSS Operating License by October 1, 2023, and is therefore unable to grant Fanatics the right to operate the Fanatics Operations in accordance with this Agreement, this Agreement shall automatically terminate.*"

6.   The Agreement also provided that the Parties would execute an amendment to the Agreement which set forth the standard termination rights, however such amendment was never entered into.

3

7. On August 14, 2023, the parties submitted their joint application for licensure in the state of Arizona as an event wagering operator to the Arizona Department of Gaming ("Department"), which is authorized under A.A.C. Rule 19-4-106(C).

8. On August 25, 2023, Clifford Holden of the Department e-mailed Alex Smith, Fanatics VP of Regulatory Affairs, to seek clarification as to whether TSS and Fanatics were seeking to offer retail event wagering *in addition to* mobile event wagering.

9. Alex Smith replied:

"Our overarching joint goal is to build an Arizona business that maximizes revenue to our respective parties and to the state, and to grow the overall sports wagering market in Arizona. We believe a retail sportsbook can help further those goals, and we'd eagerly pursue an opportunity to develop a retail site in the Sugar Skulls' hometown. FBG currently operates three premier retail sportsbooks at other professional sports team stadiums (Washington Commanders, Columbus Blue Jackets, Cleveland Guardians) and will operate several other retail books when its planned acquisition of PointsBet closes, so the Company has the expertise and experience needed to build a first rate sportsbook in Tucson.

We are of course cognizant of the ongoing retraction in our industry, and would only want to develop a retail site that maximizes the stability and long-term profitability of our AZ business. To that end, we would work closely with the Sugar Skulls to evaluate a retail opportunity, and would seek out partnerships that would help ensure the long-term success of the site, which is in the best interests of FBG, the Sugar Skulls, and the State of Arizona."

10. In his email, Clifford Holden also inquired about the seating capacity of TSS home games and requested a seating map.

Alex Smith replied:

Between the arena and exhibit hall - which are contiguous within the facility - the Sugar Skulls' home site seats 12,800 people. A seating chart is attached. While data for 2023 is not yet available, the Sugar Skulls have averaged roughly $500,000 in ticket sales in prior seasons.

Holden replied:

you mention the combined seating capacity for the arena and exhibit hall is 12,800. However, from the map, it appears that the exhibit hall accounts for 6,000 seats, but there is no listed number of seats for the arena. There is also nothing showing how the total of 12,800 was met. Can you please provide a map that notes the seats listed for the arena like you have done for the exhibit hall?

Alex Smith replied:

Cliff - Attached is a breakdown of seating capacity by pricing zone in the arena, which lists 6,824 seats. Additionally, this chart doesn't capture 14 field suites with seating for 112. Hope this helps.

Holden replied:

This does help, thank you.

11. Four days later, on August 29 the Department issued a Determination Letter that stated in pertinent part:

The Arizona Department of Gaming (the "Department") has reviewed the application for an Event Wagering Operator License submitted by FBG Enterprises Opco, LLC, dba Fanatics Sportsbook ("Fanatics") as the designee for the Tucson Sugar Skulls ("TSS"). The TSS and Fanatics' application indicates that they are

4

**VERIFIED COMPLAINT**

seeking licensure as an Event Wagering Operator under A.R.S. § 5-1301(7)(a) and A.A.C. Rule 19-4-106(C) **to operate retail and mobile event wagering**.

The Department hereby provides TSS and Fanatics with notice that it has reached a determination that they do not meet the qualifications for the applied for licensure under A.A.C. Rule 19-4-106(C)(1), specifically because TSS/Fanatics does not meet the requirements of A.R.S. § 5-1304(D)(1), read in conjunction with A.R.S. § 5-1301(18) as is required.

12. It was apparent that, based on the Determination Letter stating that the "application indicates they are seeking licensure to operate retail AND mobile event wagering, the Department took Fanatics' email to indicate that TSS/Fanatics were applying for retail wagering.

13. At no time did TSS grant Fanatics the authority to authorize an application for retail wagering.

14. The fact that the application was for retail wagering was listed as the sole basis for denial of the license.

15. It is well settled that in order to qualify for a **retail** wagering license, a pro sports team must possess a "sports facility" with a seating capacity of over 10,000 seats.

16. Fanatics should not have applied for the retail wagering license, absent the contractual authority, and with the knowledge that there was no evidence to support the existence of a 10,000+ seating capacity.

17. The scope of the Agreement specifically provided that "TSS shall grant and permit Fanatics the right to offer and operate an <u>online sportsbook</u>, while Section 10.1 re-enforces that the parties would need a separate agreement to offer retail wagering.

18. This unilateral decision, unsupported by contractual authority, was cited in the Determination Letter as the reason for denial. In other words, had Fanatics simply replied, "No," to the Department's question regarding offering retail wagering, the license would have been approved on August 25, 2023.

19. There is no dispute that TSS/Fanatics qualify for mobile wagering, which is why the scope of the parties Agreement was limited to mobile wagering.

20. On September 22, 2023, TSS and Fanatics filed an appeal to the agency decision pursuant to <u>A.R.S. § 41-1092.03</u> by and through its joint counsel, Heidi McNeil Staudenmaier of Snell & Wilmer.

5

21. On September 22, 2023, TSS and Fanatics also requested an informal settlement conference pursuant to A.R.S. § 41-1092.06(A).

22. The primary bases for the appeal were as follows: (1) the Department's Licensure Decision was contrary to law as any seating capacity requirement does not apply to Petitioners; (2) the Licensure Decision was arbitrary and capricious as other professional sports teams in Arizona operate mobile event wagering platforms despite not meeting a 10,000 seat sports facility threshold; and (3) even if the sports facility concept and associated minimum seating capacity were applicable to Petitioners' Application, the Sugar Skulls' arena has an actual capacity in excess of 10,000 seats.

23. On September 25, 2023, TSS signed a joint representation agreement with Snell & Wilmer for Snell & Wilmer to serve as local counsel for Duane Morris, which would handle the appeal, advocate for the granting of the application, and serve the best interests of both parties.

24. On September 25, 2023, the TSS received an email invitation for the informal settlement conference to be held October 16, 2023.

25. On September 26, 2023, prior to and cognizant of the automatic termination of the Agreement, Cathy Guy emailed Alex Smith of Fanatics the following, seeking confirming that the Agreement would not automatically terminate on October 1:

> Hi Alex,
>
> To ensure we are following our mutual agreement can we have an informal exchange that our partnership will continue through the end of October or at the very least until after the ADOG conference and outcome.

26. On September 27, 2023, Alex Smith added Ari Borod on copy to the email and wrote:

> "Cathy - Yes, we're of course hopeful that the settlement conference yields a path forward, and we view our partnership as ongoing."

27. TSS relied on the email confirmation from Alex Smith that the partnership was ongoing.

28. TSS understood that the affirmative written statement that the "partnership was ongoing" as waiving the October 1, 2023 automatic termination provision contained in Section 3.5 of the Agreement.

6

**VERIFIED COMPLAINT**

29. TSS understood that Fanatics and TSS would continue to jointly appeal the Department's decision.

30. TSS also relied on subsequent actions taken by Fanatics after the October 1, 2023 date to believe that the partnership was ongoing and that the automatic termination provision had been waived.

31. On October 11, 2023, Duane Morris LLP sent a joint representation agreement to TSS to serve as counsel for the appeal and to serve the best interests of both parties.

32. Duane Morris was to be paid by Fanatics on behalf of TSS.

33. TSS reasonably relied that Fanatics hiring attorneys who were contracted to jointly represent TSS and Fanatics interests in the appeal process after October 1, 2023, coupled with the statement by Alex Smith that the "partnership was ongoing" further evidenced that automatic termination provision was no longer applicable and that the parties were working to successfully fight the appeal together.

34. The Appeal Hearing was set for November 21, 2023.

35. On October 12, 2023, Fanatics commissioned a seat capacity study whereby the seating capacity of the Tucson Convention Center was determined to be in excess of 10,000 seats.

36. On October 16, 2023, TSS and Fanatics jointly participated in an informal settlement conference.

37. On October 25, 2023, Fanatics and ADOG agreed to continue the Appeal Hearing from November 21 to a status conference only on January 22, 2024.

38. On October 30, 2023, Snell & Wilmer withdrew its representation as to TSS, due to a conflict.

39. During the month of November, TSS and Fanatics remained engaged in regular discussions regarding a path to approval and strategies for a low-friction resolution of the appeal.

40. Fanatics understood that TSS would enlist the help of local businesses, politicians, and citizens to advocate for the re-consideration of the license.

41. Fanatics understood that TSS was compelled to hire its own legal counsel since Snell & Wilmer had withdrawn.

42. TSS and Fanatics had a mutual understanding that Fanatics desired to remain in the good graces of the Department and would prefer to refrain from a long, drawn out appeal.

7

**VERIFIED COMPLAINT**

43. Fanatics knew and acknowledged that TSS would do the heavy lifting of zealously advocating for a settlement that would lead to immediate approval of the license.

44. On December 13, 2023, TSS engaged in a settlement conference with the Department.

45. On December 14, 2023, TSS sent Fanatics an email with an explanation of the legal position of TSS that was presented to the Department in an effort to compel settlement.

46. In this email, TSS also stated:

"If you do not plan to be our partner any longer, then we will need to discuss our next steps, as we are in an active appeal as co-parties, and because we are relying on the fact that we are working towards getting this application approved together."

47. In response to this email, Ari Borod of Fanatics replied on December 14, 2023:

"As we've discussed over the past 6 weeks, Fanatics does not want to engage in a drawn out appeal process with ADG. We understood you were working on the political front and we committed to be patient to see if there was a low-friction path into the market. However, at this stage, we are not comfortable continuing to further dispute the current decision with ADG."

48. TSS responded to Ari's email:

"I urge you to stay patient. There are still things happening…"

49. On December 20, 2023, TSS and Fanatics participated in a phone call whereby Fanatics stated that they were exploring alternative options to enter the market with its original tribal partner.

50. TSS advised Fanatics that it had already put into motion the steps needed for a settlement to be reached with the Department and that it could not simply unwind those actions.

51. In an e-mail on December 20, 2023, Ari Borod of Fanatics sent an email:

"As discussed on the call, we have now discussed with our original tribal partner the current plan for them and their current operator to wind-down their Arizona event wagering operation. We have been advised that their wind-down is complete as of today and that they have asked the ADG to accept the relinquishment of their license. We have not been provided an exact timeframe for when the ADG will accept the relinquishment, but once that happens, we plan to immediately request the withdrawal of our appeal."

52. In response to the email on December 21, 2023, counsel for TSS and Fanatics met and conferred regarding TSS's position that Fanatics had breached its Agreement with TSS and that TSS was relying on the fact that both parties were acting in good faith in support of the Agreement.

53. TSS advised Fanatics that the Christmas and New Year's holiday would slow things down, but after the New Year a resolution should be quickly reached which would lead to the immediate determination that TSS and Fanatics qualified for a license.

54. On January 3, 2024, TSS reached a verbal settlement with the Department because TSS submitted additional, sufficient evidence to support the qualification for licensure.

8

**VERIFIED COMPLAINT**

55. On January 3, 2024, counsel for TSS verbally communicated the settlement terms to counsel for Fanatics on a phone call whereby Counsel stated he would relay the terms to Fanatics.

56. Counsel for TSS advised Fanatics that upon approval of the settlement by the Department in writing, Fanatics and TSS would be approved for the license.

57. During the entirety of the appeal process and settlement negotiations, Fanatics has never affirmatively confirmed termination of the Agreement via notice or conduct.

58. Fanatics has, rather, relied on and caused TSS to rely on Fanatics' written confirmation that "the partnership was ongoing" and Fanatics' course of conduct indicated a partnership still existed.

59. At no time, did Fanatics attempt to formally withdrawal its appeal or application with the Department.

60. TSS understood this inaction to indicate that the parties were still in contract, and appealing the Department's decision with an eye on informally resolving the dispute through settlement, which is exactly what happened.

61. On January 16, 2024, Ari Borod called Kevin Guy of TSS and indicated that the Department was opening a new application period in February and that Fanatics would be withdrawing its appeal in the current matter so that it may apply for licensure with a tribe.

62. Borod indicated that it believed this was Fanatics' fastest method of entry into doing business in the state.

63. Kevin Guy indicated to Borod that this move was seen as hostile and that it would be opposed and contested because there was a valid Agreement between the parties and without Fanatics the Department could determine that the issue of licensure was moot.

64. On January 17, 2024 Kevin Guy reiterated to Borod that the Department had verbally approved the settlement, a written confirmation of which, would be coming within two days and that if approved, Fanatics would be approved with TSS for a license.

65. On January 17, 2024, the parties set a call for 5:00pm. However, TSS was forced to re-schedule the call for the following day.

66. On January 17, 2024, at 7:59pm, Fanatics, through its counsel at Snell & Wilmer, filed a motion to withdrawal its appeal in the Office of Administrative Hearings ("OAH").

9

**VERIFIED COMPLAINT**

67. On January 18, 2024, TSS filed an objection to the Withdrawal in the OAH, citing the underlying contractual dispute and the irreparable harm that TSS would suffer if the appeal and therefore the application for licensure were unilaterally withdrawn to TSS's extreme detriment and in breach of the valid Agreement between the parties.

68. On January 18, 2024, the Department delivered the written settlement offer to TSS, which confirmed the verbal terms of the settlement and led to an immediate determination that TSS and Fanatics were eligible for licensure.

69. At no time, has TSS agreed or given Fanatics the right to unilaterally withdrawal their joint application.

## FIRST CAUSE OF ACTION

### Breach of Contract

70. Plaintiff incorporates here paragraphs 1 through 69.

71. TSS and FANATICS entered into an AGREEMENT whereby TSS granted Fanatics the exclusive right to operate **under**, or **jointly apply** for, an Arizona sports betting permit **for which TSS is eligible to apply under state law**.

72. Whereby, the term of the Agreement was from execution until 5 years from the date in which Fanatics accepts its first real-money wager in the state of Arizona, unless earlier terminated.

73. Whereby, the scope of the Agreement specifically limited Fanatics to applying for an online sportsbook;

74. Whereby Fanatics was not authorized to apply for a retail wagering license;

75. Whereby Fanatics was deemed by the Department to have unilaterally applied for a retail wagering license in addition to a mobile wagering license in excess of the scope of the Agreement;

76. Whereby TSS's insufficient qualification for a retail license was cited as the sole reason for denial of the license;

77. Whereby the denial of the license was caused by Fanatics unauthorized conduct;

78. Whereby Fanatics agreed in writing to waive the automatic termination date of October 1;

10

79. Whereby Fanatics has engaged in a course of conduct since October 1 that would reasonably lead TSS to operate under the belief that the automatic termination provision had been waived;

80. Whereby TSS has engaged in a course of conduct in reliance that a valid Agreement still existed;

81. Whereby Fanatics has never issued a notice of termination to TSS;

82. Whereby, on January 17, 2024, Fanatics breached the Agreement by filing a Motion to Withdrawal Appeal with the OAH;

83. Whereby, a withdrawal from the appeal is essentially a withdrawal of the entire license application, which would then be deemed moot by the OAH;

84. Whereby, TSS has filed an objection with the OAH to prevent the withdrawal of Fanatics as such withdrawal would leave TSS irreparably harmed, and without a gaming partner;

85. Whereby, without a gaming partner, TSS may not proceed with its license with the Department and will be forced to hastily locate a new, willing gaming partner, without the effect of the Department's agreement that TSS qualified already;

86. Whereby the licenses available to pro sports teams are finite and once they have all been issued they are gone;

87. Whereby there are 2 remaining sports team licenses;

88. Whereby qualified gaming partners are finite;

89. Whereby TSS deems that there are no other available gaming partners as qualified or similarly situated as Fanatics;

90. Whereby TSS deems that Fanatics is irreplaceable;

91. Whereby TSS fears that without a qualified gaming partner, and with a new application period open for all interested sports teams to apply now, TSS is at a disadvantage to secure a license at all;

92. Whereby TSS reiterates that it has already qualified for a license with Fanatics;

93. Whereby TSS was able to negotiate a settlement with the Department that negated all of the detriment caused by Fanatics' unauthorized application for retail wagering and immediately grant the license as to Fanatics and TSS;

94. Whereby TSS has been damaged due to Fanatics breach.

11

**VERIFIED COMPLAINT**

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

95. Plaintiff incorporates here paragraphs 1 through 94.

96. In every contract, there is an implied covenant of good faith and fair dealing which requires that neither party will do anything to injure the right of the other to receive the benefits of the Agreement.

97. TSS and Fanatics had a valid Agreement;

98. Whereby the Agreement implied a commitment to cooperate and work towards the common goal of successfully gaining licensure and operating an online sportsbook and iCasino in the State of Arizona.

99. Whereby Fanatics breached the implied covenant of good faith and fair dealing through various actions and inactions;

100. Whereby Fanatics application for a retail wagering license without the explicit authority from TSS, and contrary to the agreed scope limited to online wagering led to the denial of the license.

101. Whereby Fanatics' actions caused significant harm to TSS, which then had to expend considerable resources in attempting to rectify the situation caused by Fanatics' unauthorized expansion of the scope of the Agreement;

102. Whereby Fanatics, having caused the denial of the license through its unilateral actions, seeks to benefit from its own wrongdoing, to the detriment of TSS;

103. Whereby Fanatics' subsequent efforts to use the denial as a pretext to withdraw from the Agreement and seek alternative partnerships are in direct contravention of the principle that a party cannot benefit from its own breach of the implied covenant of good faith and fair dealing;

104. Whereby Fanatics unilaterally continued the appeal hearing date from November until January, during which time it sought out alternative partnerships to replace TSS;

12

**VERIFIED COMPLAINT**

105.    Whereby this action was taken without the knowledge or consent of TSS and was contrary to the interests and rights of TSS under the Agreement;

106.    Whereby this unilateral decision further delayed the eligibility of both parties for licensure and was contrary to the joint venture's objectives;

107.    Whereby Fanatics alleged that it desired a fast resolution to the licensing question but continued the appeal hearing date from November to January without the consent of TSS;

108.    Whereby Fanatics indicated to the Department that TSS and Fanatics were seeking licensure for retail event wagering, Fanatics misrepresented the joint intentions of the parties, as no such Agreement for retail wagering had been established or authorized by TSS;

109.    As a direct and proximate result of Fanatics' breaches of the implied covenant of good faith and fair dealing, TSS has suffered and continues to suffer damages.

## THIRD CAUSE OF ACTION

Misrepresentation

110.    Plaintiff incorporates here paragraphs 1 through 109.

111.    On or around September 26, 2023, Fanatics, through its representative Alex Smith, communicated to TSS in direct response to waiving the early termination provision that the partnership between TSS and Fanatics was ongoing;

112.    Whereby this could only be understood by TSS to mean that Fanatics was committed to the joint efforts to secure the event wagering license and act as a written waiver of the automatic termination provision set for October 1, 2023, under Section 3.5 of the Agreement;

113.    Whereby no termination notice was ever provided to TSS;

114.    Whereby Fanatics engaged in a course of conduct of a continued partnership;

115.    Whereby TSS has successfully negotiated for the approval of the license and now Fanatics desires to withdrawal from the Agreement with no justification other than it has double contracted ;

116.    Whereby Fanatics either knew this representation was false or made the representation recklessly without any knowledge of its truth;

13

**VERIFIED COMPLAINT**

117.     Whereby, initially unbeknownst to TSS, Fanatics was preparing a backup plan with an Indian tribe, engaging in 'double dipping,' which contradicted the commitment to the ongoing partnership with TSS;

118.     Whereby Fanatics intended that TSS rely on this misrepresentation to continue dedicating resources towards securing the event wagering license. This reliance allowed Fanatics to benefit from TSS's efforts while keeping its alternative plans with the Indian tribe as a backup option;

119.     Whereby relying on Fanatics' assurance of an ongoing partnership, TSS committed significant resources and efforts towards negotiating a settlement with the Department, under the belief that Fanatics was equally invested in the success of a "low friction" solution to licensure;

120.     Whereby as a direct and proximate result of Fanatics' misrepresentation, TSS suffered injury, including financial expenditures in the settlement process and strategic misalignment. TSS's efforts were based on the false premise of a committed partnership, while Fanatics was simultaneously pursuing an alternative path with another entity.

## **FOURTH CAUSE OF ACTION**

Promissory Estoppel

121.     Plaintiff incorporates here paragraphs 1 through 120.

122.     Whereby on September 26, 2023, Fanatics, through its representative Alex Smith, made a clear and unambiguous promise in writing to TSS by stating that the partnership was ongoing;

123.     Whereby TSS reasonably interpreted this as a commitment by Fanatics to continue their joint efforts under the Agreement, specifically in pursuing the event wagering license.

124.     Whereby on January 3, 2024, TSS verbally settled with the state, making TSS and Fanatics eligible for the event wagering license;

125.     Whereby TSS communicated this settlement to Fanatics on the same date;

126.     Whereby TSS received the written terms of the settlement agreement on January 18;

14

**VERIFIED COMPLAINT**

127.    Whereby this settlement was achieved in reliance on Fanatics' promise of an ongoing partnership, the conduct of Fanatics in encouraging TSS to explore the political avenues that turned out successful, and the mutual pursuit of the license in a low-friction manner;

128.    Whereby it was reasonable and foreseeable for TSS to rely on Fanatics' promise and conduct;

129.    Whereby Fanatics never stated orally or in writing that the Agreement had terminated; whereby Fanatics continued to operate as a partner, as it stated it would;

130.    Whereby TSS's reliance included continuing efforts towards the settlement with the state, allocating significant resources for this purpose, and not seeking alternative partnerships based on the understanding of Fanatics' commitment;

131.    Whereby despite the successful settlement to Fanatics and TSS's mutual benefit, Fanatics now seeks to withdraw from the application, intending to evade its obligations under the ongoing partnership with TSS;

132.    Whereby, Fanatics' actions now are in direct contradiction to the previously stated commitment and undermines the efforts and investments made by TSS in reliance on that commitment;

133.    Whereby as a direct result of relying on Fanatics' promise, TSS has incurred significant detriment, including financial expenditures, opportunity costs, and now faces the prospect of having a valid license but no partner to operate with, despite having a legally binding agreement that obligates Fanatics to a 5-year Term;

134.    Whereby specific performance of Fanatics' promise is necessary to prevent injustice;

135.    Whereby Fanatics stands to benefit from re-applying with a new partner, while TSS, having successfully obtained approval based on its efforts, now faces the potential of being left without a partner;

136.    Whereby enforcing the promise and the terms of the ongoing Agreement is essential to ensure TSS does not suffer undue harm due to Fanatics' breach of promise.

## **PRAYER**

15

**VERIFIED COMPLAINT**

**WHEREFORE**, TSS respectfully prays for relief against FANATICS, on each and every one of TSS's causes of action alleged herein as follows:

1. A declaration that FANATICS has breached the AGREEMENT;

2. Specific performance of the AGREEMENT, whereby FANATICS shall fulfill its obligations under the terms of the Agreement for the Term;

3. Award TSS such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of Fanatics' withdrawal from the ADOG application;

4. An award of damages;

5. An award to Plaintiffs of their reasonable litigation expenses and attorneys' fees;

6. An award to Plaintiffs of pre- and post-judgment interest, to the extent allowable; and

7. Such other and further relief as equity and justice may require.

Dated: February 14, 2024

*/s/ Eric P. O'Connor*
Eric P. O'Connor
O'CONNOR & HURT, PLLC (AZ #032316)
PO Box 15087
Phoenix, AZ 85060
Tel: 602-910-5223
eric@oconnorhurt.com

Jerry Bruce Kurz (*pro hac vice pending*)
HALL & KURZ
3117 Knollwood Lane
Glenview, Illinois 60025
Tel: 847-456-2782
arnaball@aol.com

*Attorneys for Plaintiff Tucson Indoor Football*

16
**VERIFIED COMPLAINT**

## VERIFICATION

I, Cathy Guy, Owner of Tucson Indoor Football, verify that I have read the allegations contained in this Verified Complaint; that, other than allegations made upon information and belief, those allegations are true and correct based on my knowledge and belief which, in some instances, is based on information that was provided to me from Tucson Indoor Football personnel and from Tucson Indoor Football records.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14th DAY OF FEBRUARY 2024

_____
Cathy Guy

**VERIFIED COMPLAINT**